OPINION
 

 PAUL L. FRIEDMAN, District Judge.
 

 This is a disappointed bidder case challenging the award of a contract to Management Resources, Inc. (“MRI”), by the United States Department of the Navy. The disappointed bidder, Strategic Analysis, Inc. (“SAI”), seeks a declaratory judgment that the contract was awarded in violation of the applicable law and regulations in an arbitrary and capricious fashion and that the contract therefore is void. In the alternative, plaintiff seeks injunctive relief to terminate the contract, award the contract to SAI or reopen the procurement process, in which case plaintiff asks that MRI be disqualified from further participation in this procurement. The case is before the Court on cross-motions for summary judgment and defendant’s motion to dismiss.
 

 I. FACTUAL BACKGROUND
 

 On March 21, 1995, the Office of Naval Research (the “Navy”) issued a Request for Proposals for the provision of management, administrative and technical support to the Joint Directors of Laboratories, a planning and coordination arm of the Department of Defense. Solicitation No. N00014r-95-R0001 (“RFP”) at 2-3, Administrative Record (“A.R.”), Vol. A, Tab 1. The RFP required offerors to provide key personnel in four categories: Supervisory Scientist/Engineer, Senior Analyst, Mid-Level Analyst, and Graphics/Clerical. Offerors were required to provide a resume for each of the proposed key personnel and, if the key personnel were not currently employed by the offeror, a signed letter of intent. RFP at 58-59. The RFP also required conference space within five miles of Arlington, Virginia, with a minimum of 400 square feet, viewgraph capacity and the ability to accommodate approximately 50 people. RFP at 5. In assessing the proposals, the Navy assigned the following weights to the various criteria: Technical Approach (55%), Personnel Qualifications
 
 *20
 
 (15%); Corporate Resources (15%), Corporate Experience (15%). Technical Evaluation Team Report at 5 (Aug. 25, 1995), A.R., Vol. A, Tab 18.
 

 After both SAI and MRI submitted their proposals, the Navy issued letters to each requesting “clarification to resolve minor irregularities and/or clerical mistakes.” AR., Vol. A Tabs 11 and 12. The letter to SAI requested explanation of its response to the “Small Business Concern Representation” question. SAI responded by letter of July 27,1995, explaining that it had “inadvertently omitted filling out” that section and enclosing a completed version of the section. A.R., Vol. A Tab 13.
 

 The letter to MRI requested explanation of three items, two of which are the focus of this action: (1) MRI’s response to the “Small Business Concern Representation” question (the same question asked of SAI); (2) the rough square footage of MRI’s 50-person conference room; and (3) “the employment status of your proposed Supervisory Scientist/Engineer, Mr. Raymond F. Siewert.” AR., Vol. A Tab 11.
 

 By letter of August 2, 1995, Patricia Coleman, President and CEO of MRI, responded as follows: She sent a completed version of the Small Business Response section, just as SAI had done. She provided a fuller description of MRI’s conference room and included a floor plan. Finally, she described Mr. Siewert as “a part time employee [who] works an average of 32 hours per week____ Upon award of this contract, Mr. Siewert will immediately become available to work when, where and how ever long it takes to complete all associated tasks. A copy of his signed agreement letter is attached.” A.R., Vol. A Tab 14. The signed agreement letter offered Mr. Siewert employment as a “part-time employee” in the position of “Scientist/Engineer.” The letter to Mr. Siewert was dated April 7, 1995; Mr. Siewert’s signature, acknowledging acceptance of the position, is also dated April 7, 1995. Plaintiff asserts that this letter was backdated, that MRI forged Mr. Siewert’s signature and that at the time Mr. Siewert was a consultant to MRI, not an employee.
 
 [1]
 

 On August 10, 1995, the Navy again wrote to MRI this time asking it to “explain/substantiate ... the employment status of your proposed Mid-level Analyst, Mr. Thomas P. Reidy, Jr.” A.R., Vol. A Tab 16. MRI, again through Ms. Coleman, responded on August 17 by sending a copy of Mr. Reidy’s contingent employment letter which MRI stated was “inadvertently left out of our proposal.” A.R., Vol. A Tab 17.
 

 In assessing the proposals, the Navy found that MRI and SAI were technically the top two offerors. The Contracting Officer, Anna M. Weston, noted that “SAI appears to be slightly better than MRI in both areas [of risk and potential disruption]. But this difference is so minimal as to be insignificant in practice.” CosVTechnical Tradeoff Analysis and Source Selection at 3, AR., Vol. A Tab 19. MRI’s proposed costs were $74,000 per year less than SAI’s, for a total of $370,000 over five years; Ms. Weston therefore concluded that “MRI’s proposal is the clear better value over SAI’s.”
 
 Id.
 
 MRI was awarded the contract on September 25,1995.
 

 On October 4, 1995, Ms. Coleman sent a letter to the Navy offering “further clarification regarding Mr. Siewert’s employment status.” AR., Vol. A Tab 27. According to this letter, Mr. Siewert initially was a consultant with MRI and verbally committed to become an employee and to serve as the Supervisory Engineer if MRI were awarded the Navy contract. Ms. Coleman also stated that Mr. Siewert did not personally sign the April 7 part-time employment letter of agreement but had authorized MRI to sign on his behalf.
 
 Id.
 
 Attached to the October 4 letter was a copy of a Professional Services Agreement (“PSA”), dated April 17, 1995, between MRI and Mr. Siewert, in which Mr. Siewert agreed to serve as an Independent Contractor to MRI.
 
 Id.
 
 at 2-4. The PSA was signed by Mr. Siewert and Paul Jacobs, Executive Vice President of MRI.
 
 [2]
 
 Aso at
 
 *21
 
 tached were copies of the April 7 part-time employment letter of agreement with Mr. Siewert’s name signed by MRI (allegedly on Mr. Siewert’s behalf), and an identical part-time employment letter of agreement signed by Mr. Siewert and dated October 3, 1995.
 
 Id.
 

 On October 5, 1995, SAI protested the award to MRI. A.R., Vol. A, Tab 30.
 

 On November 6,1995, Ms. Coleman sent a letter to the Navy further explaining Mr. Siewert’s employment status. In this letter she stated that Mr. Siewert had agreed to be the supervisory engineer on the. Navy contract on April 3, 1995, and that the Professional Services Agreement had been sent to him by mistake instead of an employment letter of agreement. When Ms. Coleman discovered the mistake she asked Mr. Siewert to become an employee and he agreed. Ms. Coleman stated that the part-time employment letter of agreement “was meant to take the place of the PSA; however, the date was typed incorrectly.” AR., Vol. A, Tab 34 at 2. Attached to this letter was a letter from Mr. Siewert, dated November 4, 1995, addressed to the Navy contracting officer, Ms. Weston.
 
 Id.
 
 at 3-4.
 

 In this November 4 letter, Mr. Siewert stated that he had signed the PSA on April 17, 1995, and that he had agreed on May 4, 1995 to serve as Supervisory ScientistyEngineer if MRI was awarded the contract. He further stated that “[o]n or about August 1, 1995 during a telephone conversation with Ms. Coleman, I agreed to become a part time employee of MRI. At this time I verbally agreed that Ms. Coleman could inform your office of my change in employment status.” AR., Vol. A, Tab 34 at 3. Mr. Siewert added that “while there may have been confusion over my employment status, I have been and remain committed to work on this project with MRI. I believe my integrity is being questioned through [SAI’s] protest, and I must state that at no time was there any attempt to deceive the government regarding my commitment to the project.”
 
 Id.
 
 at 4.
 

 On November 21, 1995, the Navy submitted an Agency Report setting forth the Navy’s position with respect to SAI’s protest. AR., Vol. A, Tab ii at 10. The Navy concluded that MRI had adequately represented the employment status of Mr. Siewert, noting in particular that “[g]reat credence should be given to the [November 4] statement of Mr. Siewert,” and that “binding bilateral agreements between an offeror and its key personnel are not required so long as the awarding agency is reasonably assured that the personnel are committed to the offeror.”
 
 Id.
 

 On February 5, 1996, the GAO found (1) that MRI did not intentionally misrepresent Mr. Siewert’s employment status, and (2) that the Navy improperly held discussions with MRI but that SAI had not demonstrated any prejudice. It denied SAI’s protest. AR., Vol. A, Tab iii.
 

 During this same period, SAI also protested MRI’s small business status to the Small Business Association. On September 27, 1995, MRI filed its protest. A.R., Vol. B, Tab 1. On October 25,1995, the SBA issued a size determination finding MRI to be a small business concern. A.R., Vol. B, Tab 4. SAI appealed this determination to the Office of Hearing and Appeals. AR., Vol. B, Tab 5 at 2-3. On January 16, 1996, Hearing and Appeals dismissed SAI’s appeal as moot because the contract had already been awarded. A.R., Vol. B, Tab 16.
 

 III. DISCUSSION
 

 Disappointed bidders have standing to challenge the award of government contracts based on injury not only to their economic interests but also based on injury “to [their] right to a legally valid procurement process.”
 
 National Maritime Union of America v. Commander, Military Sealift Command,
 
 824 F.2d 1228, 1237 (D.C.Cir. 1987). Plaintiff has alleged violations of the laws and regulations governing the procurement process. It therefore has standing to bring this action.
 
 [3]
 

 
 *22
 
 The parties agree that this case is governed by the Administrative Procedure Act, 5 U.S.C. §§ 701
 
 et seq.,
 
 and that the standard to be applied by this Court in considering the challenge is whether the Navy acted arbitrarily and capriciously. 5 U.S.C. § 706(2)(A). In order to show arbitrary and capricious agency action in the disappointed bidder context, a plaintiff
 

 bear[s] a heavy burden of showing either that (1) the procurement official’s decision on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.
 

 Kentron Hawaii, Ltd. v. Warner,
 
 480 F.2d 1166, 1169 (D.C.Cir.1973);
 
 see Elcon Enterprises, Inc. v. WMATA,
 
 977 F.2d 1472, 1478 (D.C.Cir.1992);
 
 Delta Data Systems Corp. v. Webster,
 
 744 F.2d 197, 203-04 (D.C.Cir.1984). As with all APA cases, the Court’s review of the agency’s action is limited to the administrative record,
 
 Camp v. Pitts,
 
 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), although the Court may supplement the record or permit discovery where necessary to make an informed decision.
 
 Public Power Council v. Johnson,
 
 674 F.2d 791, 793-95 (9th Cir.1982);
 
 see Sierra Club v. Costle,
 
 657 F.2d 298, 389 n. 450 (D.C.Cir. 1981).
 
 [4]
 

 Where an agency’s decision is reasonable, a “court is not empowered to substitute its judgment for that of the agency,”
 
 Citizens to Preserve Overton Park, Inc. v. Volpe,
 
 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), and must defer to the agency’s expertise.
 
 Delta Data Systems Corp. v. Webster,
 
 744 F.2d at 203-04. This presumption of regularity, however, will not shield an agency’s actions from a “thorough, probing, in-depth review.”
 
 Citizens to Preserve Overton Park, Inc. v. Volpe,
 
 401 U.S. at 415, 91 S.Ct. at 823. Unlike the deference due to the Navy, the Court is not required to defer to the GAO’s decision but should treat it as “an expert opinion, which [the Court] should prudently consider____”
 
 Delta Data Systems Corp. v. Webster,
 
 744 F.2d at 201.
 

 A Count 1
 

 In Count 1 plaintiff alleges that the Navy violated the Competition in Contracting Act, 10 U.S.C. § 2305(b)(4)(A), and the Federal Acquisition Regulations (“FARs”), 48 C.F.R. §§ 15.607(a) and 15.610, by conducting “discussions” with MRI but not with SAI, and thereafter failing to request best and final offers (“BAFOs”) from all competitive offerors. SAI claims that it was prejudiced because (1) without such discussions MRI would have been disqualified, and (2) even if MRI had not been disqualified, if SAI had been given the opportunity to submit a BAFO it would have reduced its costs and likely would have received the contract.
 
 [5]
 

 The structure and requirements of the applicable regulations support plaintiff’s position. The FARs provide that a contracting officer may not conduct discussions with one offeror without holding discussions with all offerors, 48 C.F.R. § 15.610(b), unless the communication is merely “for the purpose of minor clarification.” 48 C.F.R. § 15.610(a); see 48 C.F.R. § 15.607. A communication is for “clarification” if it is “for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal.” 48 C.F.R. § 15.601. By contrast, a communication is a “discussion” if it “involves information essential for determining the acceptability of a proposal [or] provides the offeror an opportunity to revise or modify its proposal.” 48 C.F.R. § 15.601.
 

 The issues that MRI was asked to address in the Navy’s July 26 and August 10 letters— namely, the employment status of two of its key personnel, Mr. Siewert and Mr. Reidy, and the capacity of its conference room— involved “information essential for determining the acceptability of the proposal.” And if the information provided had been unacceptable, MRI could have been disqualified from consideration for award of the contract. The
 
 *23
 
 Court therefore concludes that the communications were “concessions” within the meaning of the FARs.
 
 See Blue Cross and Blue Shield of Maryland, Inc. v. Dep’t of Health and Human Services,
 
 718 F.Supp. 80, 87 (D.D.C.1989).
 
 [6]
 

 Under the regulations, once the Navy had discussions with one bidder, it was required to have discussions with “all responsible offerors who submit proposals within the competitive range.” 48 C.F.R. § 15.610(b). While a contracting officer may not advise one offeror of the nature of its discussions with another, it must advise all offerors within the competitive range of deficiencies in their proposals and provide them with the opportunity to submit cost, price or technical revisions. 48 C.F.R. § 15.610(c). Upon completion of such discussions, “the contacting officer
 
 shall
 
 issue to all offerors still within the competitive range a request for best and final offers.” 48 C.F.R. § 15.611(a) (emphasis added). “The rule is designed to prevent a bidder from gaining an unfair advantage over its competitors by making its bid more favorable to the government in a context where the other bidders have no opportunity to do so.”
 
 Data General Corp. v. Johnson,
 
 78 F.3d 1556, 1561 (Fed.Cir. 1996). SAI and MRI were the two finalists, the only two responsible offerors within the competitive range. Yet the Navy held discussions with MRI and not with SAI and failed to request best and final offers from either, despite the mandatory language of the FARs.
 

 Having identified a clear violation of the applicable regulations, plaintiff must demonstrate prejudice. The test for prejudice is “whether it was reasonably clear that another bidder, given the benefit of the similarly relaxed requirement ... would have bid in such a manner that it would have been in line for the award.”
 
 Irvin Industries Canada, Ltd. v. U.S. Air Force,
 
 924 F.2d 1068, 1074 n. 71 (D.C.Cir.1990). Stated another way, “[t]o establish prejudice, a protestor is not required to show that but for the alleged error, the protestor would have been awarded the contract____ [Rather,] to establish prejudice, a protestor must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract.”
 
 Data General Corp. v. Johnson,
 
 78 F.3d at 1562.
 

 As noted, once discussions are held the contracting agency is required to call for BAFOs from all competitive offerors. 48 C.F.R. §§ 15.611(a), (c). Defendant asserts that since the price differential between the MRI and SAI bids was substantial and was due to SAI’s higher overhead costs, which would have been nearly impossible to reduce, SAI could not have made a better offer even if given the opportunity to submit a BAFO. It argues that SAI therefore suffered no prejudice. In rebuttal, SAI offers the affidavit of its president, Bradford Smith, in which Mr. Smith states that if BAFOs had been requested, SAI would have lowered its price sufficiently to have been awarded the contract. Affidavit of Bradford L. Smith, Jr. ¶ 5 (Oct. 31,1996).
 
 [7]
 

 Without revealing the specific information contained in the Smith affidavit, which was filed under seal, the Court finds that if notice and opportunity to submit a BAFO had been provided, any competitive bidder would have made substantial efforts to cut costs, and it concludes that SAI’s proposed cuts were reasonably likely to have brought it into competitive range with the bid submitted by MRI. At that point SAI’s incumbency and slight technical superiority would have come into play. Moreover, it appears that SAI may have included certain costs in its cost proposal, such as travel and commuter time, that
 
 *24
 
 MRI did not.
 
 Compare
 
 A.R., Vol. A, Tab D2 at 3-8
 
 with
 
 AR., Vol. A Tab D1 at 7-8. “Had the [Navy] given [SAI] the same (and equal) opportunity [it gave MRI], it may have been able to establish that its proposal, rather than [MRI’s], was most advantageous to the Government.”
 
 Blue Cross and Blue Shield of Maryland, Inc. v. Dep’t of Health and Human Services,
 
 718 F.Supp. at 88.
 

 In view of the fact that MRI and SAI were the only two viable competitors for the project at the time discussions were held with MRI by the Navy, plaintiff has shown that there was a reasonable likelihood that it would have been awarded the contract absent the irregularities. First, SAI has demonstrated a strong likelihood that it would have significantly lowered its price had BAFOs been requested of both it and MRI, as they should have been. Second, SAI was the incumbent contractor, and its technical proposal was rated slightly higher than MRI’s. AR., Vol. A Tab 19 at 3. Third, had the Navy not engaged in unilateral discussions with MRI, the lack of a letter of intent for Mr. Reidy, the lack of clarity about Mr. Siewert’s employment status, and the failure to designate the capacity of the conference facilities could well have disqualified MRI completely. Finally, had the Navy known about Mr. Siewert’s actual employment status as an independent contractor at the time of the bid, MRI might well have been disqualified as a small business and thus been eliminated from the bidding process altogether.
 
 [8]
 

 Because plaintiff has demonstrated a clear violation of the applicable regulations and the requisite degree of prejudice, this case will be remanded to the Navy to engage in a new round of discussions and requests for BAFOs with all the offerors that were initially in the competitive range, namely SAI and MRI. In deference to the Navy’s expertise in these matters, however,
 
 Delta Data Systems Corp. v. Webster,
 
 744 F.2d at 203-04, the Court will not order the contract canceled, but the Navy, in its discretion and in view of all the facts and circumstances now known, may cancel the contract if it decides in light of the evidence that such action is warranted.
 
 See Blue Cross and Blue Shield of Maryland v. Dep’t of Health and Human Services,
 
 718 F.Supp. at 89.
 

 B. Count 2
 

 Plaintiff alleges in Count 2 that because MRI misrepresented Mr. Siewert’s employment status, the Navy’s determination to award the contract to MRI was irrational.
 
 See Ralvin Pacific Properties v. United States,
 
 871 F.Supp. 468, 473 (D.D.C.1994) (vacating award of a contract in part because the awardee made material misrepresentations on which the GSA relied).
 

 The record shows that MRI depicted Mr. Siewert as an employee in its bid and in its August letter even though he was only a consultant at the time, that he worked 32 hours a week when it is not clear that he did, Deposition of Raymond F. Siewert (“Siewert
 
 *25
 
 Dep.”) (June 12, 1996) at 8-9, 109-110, and that the letter purporting to be signed by Mr. Siewert was not.
 
 [9]
 

 See
 
 note 10,
 
 infra.
 
 While MRI subsequently explained the seeming contradictions as inadvertent errors, the many discrepancies in dates and issues concerning the authenticity of documentation raise questions that may effect the integrity of the contracting process. Indeed, the SBA Office of Hearing and Appeals noted that but for mootness, it would have remanded the proceedings in view of the issues raised by SAI on appeal. A.R., Vol. B., Tab 16 at 3 & n. 3.
 

 The fact is, however, that the Navy had the opportunity to consider many of these issues at the time of SAI’s protest, and it chose to accept MRI’s explanations. In particular, the Navy gave careful consideration to Mr. Siewert’s letter of November 4, 1995, in which he stated that no misrepresentations were made about his employment. A.R., Vol. A, Tab ii at 10. In view of Mr. Siewert’s testimony at his deposition, however, the Court now has additional or at least more detailed information than the Navy had.
 
 See
 
 Deposition of Raymond F. Siewert (“Siewert Dep.”) (June 12, 1996).
 
 [10]
 
 In large part, however, Mr. Siewert in his deposition restated what he represented to the Navy in his November 4 letter, namely, that although he was technically a consultant when the bid was submitted he fully expected to become an employee if the bid was awarded.
 

 The APA does not authorize the Court to substitute its judgment for that of the agency even if, in view of the information before the Court, it might have reached a different conclusion in the first instance.
 
 Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,
 
 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978);
 
 see Elcon Enterprises, Inc. v. WMATA,
 
 977 F.2d at 1478;
 
 Delta Data Systems Corp. v. Webster,
 
 744 F.2d at 203. The agency was entitled to accept MRI’s explanations about Mr. Siewert’s employment status, as amplified by Mr. Siewert’s own submission, and the Court cannot find that it was irrational to do so.
 
 See Elcon Enterprises, Inc. v. WMATA,
 
 977 F.2d at 1478. Since the Court’s disposition of Count 1 requires a remand to the agency, the Navy will have further opportunity to consider all the facts, including those that troubled the SBA and this Court.
 
 [11]
 

 An Order consistent with this Opinion is entered this same day.
 

 SO ORDERED.
 

 ORDER
 

 For the reasons stated in the Opinion issued this same day, it is hereby
 

 ORDERED that plaintiffs motion for summary judgment on Count 1 is GRANTED; it is
 

 FURTHER ORDERED that judgment is entered for plaintiff on Count 1; it is
 

 FURTHER ORDERED that plaintiffs motion for summary judgment on Count 2 is DENIED; it is
 

 FURTHER ORDERED that plaintiffs motion for summary judgment on Count 3 is DENIED without prejudice; it is
 

 FURTHER ORDERED that defendant’s motion to dismiss or for summary judgment is GRANTED in part and DENIED in part. Count 2 is dismissed with prejudice, and Count 3 is dismissed without prejudice; and it is
 

 
 *26
 
 FURTHER ORDERED that this case is remanded to the Office of Naval Research (“ONR”) for proceedings consistent with this Opinion. ONR is directed to consider the entire record in this case and promptly issue a request for best and final offers to all offerors initially determined to have been within the competitive range for this contract.
 

 SO ORDERED.
 

 [1]
 

 . Mr. Siewert was also a consultant to SAI at the time.
 

 [2]
 

 . Ms. Coleman and Mr. Jacobs collectively own all the stock of MRI. Ms. Coleman owns 51 percent; Mr. Jacobs owns 49 percent. A.R., Vol. B, Tab 4 at 2.
 

 [3]
 

 . While defendant argues that plaintiff lacks standing because SAI has failed to show injury in fact, this argument conflates
 
 standing,
 
 which SAI clearly has, with
 
 prejudice,
 
 which is discussed
 
 infra.
 

 [4]
 

 . By Order of May 29, 1996, the Court granted plaintiff's motion to depose Raymond F. Siewert.
 

 [5]
 

 . Defendant has moved to dismiss Count 1 for lack of standing, arguing that plaintiff has demonstrated no injury in fact. As noted above, plaintiff has standing to assert the procedural injury.
 

 [6]
 

 . The GAO also found that the Navy conducted discussions with MRI, at least with respect to Mr. Reidy’s employment. A.R., Vol. A, Tab iii at 4 &n. 1.
 

 [7]
 

 . Defendant argues that the Court cannot consider the affidavit of SAI President Smith because it was not part of the record before the agency. It is true that normally judicial review of an agency decision is limited to the record compiled by the agency.
 
 Camp v. Pitts,
 
 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The Federal Circuit, however, has recently indicated that the submission of an affidavit of a company executive under circumstances such as these is a proper way to demonstrate prejudice.
 
 Data General Corp. v. Johnson,
 
 78 F.3d at 1563.
 

 [8]
 

 . The Small Business Act requires that 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern. 15 U.S.C.- § 644(o )(1)(A);
 
 see
 
 48 C.F.R. § 52.219-14. There is no dispute that MRI was required to comply with the 50 percent rule or that the presence of Mr. Siewert as a consultant and not an employee rendered MRI out of compliance.
 

 Defendant argues that because plaintiff did not raise Mr. Siewert's employment status in its initial protest on September 27, 1995, plaintiff has failed to exhaust its administrative remedies and is untimely with respect to this issue. It maintains that this Court therefore lacks jurisdiction to consider whether MRI would have qualified as a small business. The Court is unpersuaded. The SBA Administrative Law Judge thought that SAI had raised issues that should be considered on remand but for the fact that the contract had already been awarded, noting that "but for her mootness finding, she would have remanded the proceeding to the Area Office in view of the persuasiveness of Appellant’s assertions in its appeal.” A.R., Vol. B, Tab 16 at 3 & n. 3. Moreover, as of September 27, two days after MRI got the contract, SAI had no way of knowing that Mr. Siewert's employment status played a key role in MRI's having obtained the contract since SAI was not debriefed until October 2, 1995. A.R., Vol. A, Tab 26. Accordingly, SAI’s initial failure to raise the issue was not its fault,
 
 see
 
 13 C.F.R. § 121.1707 (Jan. 1, 1995); SAI raised the issue as soon as it could through its appeal. The Court concludes that SAI has exhausted its remedies with respect to this issue and that the Court therefore may consider the small business status of MRI at least in determining whether SAI has demonstrated prejudice.
 

 [9]
 

 . At issue is the suggestion that misrepresentations were made and not the mere fact that Mr. Siewert was not yet an MRI employee. Since the RFP specifically provided for letters of intent for individuals who were not yet employees, the Navy apparently contemplated just such an arrangement. A.R., Vol. A, Tab 1 at 58. There is, of course, a serious question whether a letter of intent would have satisfied the SBA even if it had satisfied the Navy.
 

 [10]
 

 . For example, Mr. Siewert stated in his deposition that he did not authorize MRI to rewrite his resume and send it to the Navy, he did not expressly authorize MRI to sign his name to the employment offer letter of April 7, and did not know who signed his name. Siewert Dep. at 57-58, 94-95.1 He also testified that he was not an employee of MRI on August 2, 1995. Siewert Dep. at 52, 84.
 

 [11]
 

 . In light of the disposition of Count 1, the Court does not reach the merits of Count 3. Plaintiff's motion for summary judgment on Count 3 will be denied without prejudice.